## STROUSE & BROTHERS *vs*. AMERICAN CREDIT-INDEMNITY COMPANY OF NEW YORK.

*Construction of a Bond Granting Indemnity Against Losses Resulting from Insolvency of Debtors—What Constitutes Insolvency—Ascertainment of Initial Loss to be Borne by the Indemnified—Proof of Sale and Delivery of Goods—Right of Indemnified to Compromise Claim—Extension of Time of Payment—Rating by Mercantile Agency of Debtors.*

Defendant, a credit-indemnity company, sold to plaintiffs, merchants, a bond of indemnity guaranteeing plaintiffs against loss to the extent of $20,000 resulting from the insolvency of debtors, over and above a net loss of $7,500 first to be borne by the indemnified, on total of gross sales of goods amounting to $1,600,000 or less made between June 1st, 1893, and May 31st, 1894.   The bond was based upon certain conditions made part of the contract.   Two of these related to the insolvency of debtors resulting in loss to the indemnified and provided that "general assignments of, or attachments against, insolvent debtors, the absconding of the debtors, or execu-

tions returned *nulla bona* shall constitute insolvency." "The appointment of a receiver, a sell-out or the death of a debtor does not establish insolvency, but the indemnified may prove such claim during the term of this bond or renewal thereof, provided legal proof shall be given establishing the insolvency of the debtor." *Held,* that the insolvency against which the bond afforded indemnity means the inability of a debtor to pay his debts as they fall due in the usual course of business, and that the circumstances mentioned in these conditions do not create the status of insolvency, but are simply evidence of it, and that consequently the fact of the insolvency of a debtor may be proved in other ways as well as in those set forth.

The bond also provided that a net loss of $7,500 should first be borne by the indemnified. One of the conditions stated that "it is agreed that such sum of gross loss shall be the limit to be borne by the indemnified as less twenty-five per cent will equal the agreed amount of annual net loss; all claims making up such said sum of gross loss to remain the property of the indemnified." *Held,* that this provision means that a gross loss which, after twenty-five per cent of it shall be deducted from it, will equal the net loss, shall be the measure of the initial loss; and in this case it is the sum of $10,000, because deducting twenty-five per cent or $2,500 from $10,000 leaves $7,500.

The conditions of the bond also required two proofs of loss to be submitted, one within twenty days after the indemnified received knowledge of the insolvency of a debtor, and the other, a final proof of loss, within twenty days after the expiration of the bond, and the company agreed to pay within sixty days after final proof of loss. *Held,*

1st. That the ascertainment of the initial loss to be borne by the indemnified must be computed as of the date of the expiration of the bond and not as of the dates of the failures of his debtors which first occur.

2nd. That the gross loss which has first to be borne by the indemnified should be made up of those losses that first occurred, and that those payments which the indemnified is entitled to retain in reduction of his initial gross loss are those which are made after the time for adjustment upon claims included in the initial loss, whilst the payments which the company is entitled to receive in reduction of its loss are those made after the same period on debts which form the basis of its liability.

A stipulation annexed to said bond and called a rider, provided that "in consideration of the lapsing of certificate No. 1204 in U. S. Credit System Company, it is agreed that any losses which occur subsequent to the expiration of said certificate and which would be provable under a renewal of said certificate may be proved hereunder in accordance with the terms and conditions of this bond." Under that certificate the U. S. Company agreed to pay plaintiffs a

sum not exceeding $20,000 in excess of $6,250 on total gross sales made between June 1st, 1892, and May 31st, 1893, as the plaintiffs should actually lose on such shipments from insolvent debtors whose insolvency occurred after the payment of the guaranty fee, and who had a certain credit rating in Dun's books and whose debts did not exceed $5,000 for any one debtor. It was also agreed that the $6,250 mentioned in the certificate was the amount of the initial loss first to be borne by the indemnified. *Held*, that all the terms and conditions of the certificate were carried into the bond, and that as to claims which the bond covered, the indemnified were required to bear an initial loss of $10,000 before the indemnitor became liable under the bond, and that as to the claims which a renewal of the certificate would have covered the indemnified were required to bear an initial loss of $6,250 before the indemnitor would become liable under the rider attached to the bond.

Another condition of the bond provided that liability under it is limited to actual sales of goods owned, sold and delivered by the indemnified. The defendant alleged that there was no sufficient proof of the delivery of certain goods claimed as losses by the indemnified. There was proof by the salesman who took the orders for the goods from the various debtors that they were forwarded to the plaintiffs, and proof by the shipping clerk that such goods were packed and delivered to common carriers and bills of lading and invoices mailed to the purchasers, which latter were never returned. *Held*, that this is legally sufficient evidence to go to the jury to prove sales, shipments, deliveries and acceptance.

Some of the sales made by plaintiffs, for which indemnity under the bond was claimed, were made to G. & Co. and to M., G. & Co. G. carried on business in three places as G. & Co. and in another place with M. as a partner, as M., G. & Co. The goods for all the houses were bought by G. and charged to him, but the particular establishment for which they were bought was designated on plaintiffs' ledger. *Held*, that it was for the jury to determine whether these concerns were identical or independent.

The plaintiffs compromised some of their claims against insolvent debtors. There was no provision in the bond denying their authority so to do. *Held*, that in the absence of evidence to show that more money could have been secured from the debtors than was obtained by the compromises, the defendant cannot escape liability in respect of such claims.

A condition of the bond provided that no credit should be covered by it unless the debtor should have a certain rating in Dun's Mercantile Agency book. One of the parties to whom the plaintiff sold goods had establishments in different cities besides Baltimore. Under the heading of Baltimore in the book he was given the required rating. Under the headings of the other cities the entries were " see Balti-

more." *Held*, that these entries were repetitions of the rating given under the Baltimore heading.

The bond and certificate declared that losses on claims in extension at the time of the payment of the guaranty fee shall not be included in the calculation of losses. *Held*, that plaintiffs' action in requiring promissory notes to be given by debtors as evidence of their indebtedness on open accounts, and making the notes payable at a later date than the open accounts would have become due, does not constitute an extension

Cross-appeals from the Superior Court of Baltimore City (RITCHIE, J.) Plaintiffs obtained a judgment below for $8,240.14. Some of the conditions of the bond sued on in this case, in addition to those mentioned in the opinion of the Court, are as follows :

6. Liability under this bond is limited to actual sales of goods, wares or merchandise, owned, sold and delivered by the indemnified.

12B. When claims shall be allowed by this company beyond the amount agreed to be borne by the indemnified, such claims shall at once be transferred to this company, and this company shall become the owner thereof to the extent of the amount paid on such claims ; provided, however, that where the indemnified has a part interest in any one of such claims the amount realized therefrom, less cost of collection, shall be divided *pro rata* as the interest of each may appear.

At the time of the issuance of the bond the appellees held a similar instrument of the United States Credit System Company of Newark, New Jersey, and to the bond is attached a "rider," which states that in consideration of the lapsing of that certificate the appellant agreed that any losses which should occur subsequent to the *expiration* of said certificate, and which would be provable under a renewal of it, might be proved under said bond in accordance with its terms and conditions; provided that no claim *under extension* at the time of the payment of the premium should be included under the protection of the bond.

Certificate No. 1204 of the United States Credit System

Company, referred to in the rider attached to said bond, states that on receipt of the premium of $580 and compliance by the appellees with all the provisions of it, the said Company agrees to pay the appellees such a sum of money (not exceeding $20,000) in excess of the sum of $6,250, as the appellees may actually lose on shipments, on legally ·ascertained insolvent debtors, whose insolvency occurred after the payment of the said premium, of which the said company had been notified upon its notice of failure blanks, * * * and who in the latest existing book of R. G. Dun & Co., prior to each shipment of merchandise, were rated from the capital mark of H and upward, with either the first or second credit mark for such respective letter capital mark, or K 3½, and for an amount not exceeding thirty-five per cent of such lowest capital rating. The said certificate further provides that no *account* shall exceed $5,000; and there shall be deducted from all *claims* twelve and a half per cent and all amounts procured or procurable; and that where any claim exceeds the amount covered by the said certificate the amount procured or procurable thereon shall be deducted *pro rata*.

The trial Court gave to the jury the following instructions of its own motion, which are set forth in the sixth bill of exceptions :

I. The Court instructs the jury that by the terms of the bond sued on in this case, which has been offered in evidence, the plaintiffs must first bear an initial gross loss of $10,000 before any liability under said bond on the part of the defendant is to be allowed by them.

The Court further instructs the jury that in computing said initial gross loss of $10,000, they shall take the provable losses resulting from insolvency of debtors, in the order of time in which said provable losses occurred, until the aggregate amount of said losses equals the said initial gross loss of $10,000.

They are further instructed, that in computing said initial gross loss of $10,000, they are to take the amounts found

to be due from the several debtors whose indebtedness goes to make up said aggregate amount of $10,000 at the time of the expiration of said bond, and are to make no deductions therefrom for collections made by the plaintiffs on account of said debts after the expiration of said bond on May 31st, 1894.

They are further instructed that what are " provable losses " and what is " insolvency " (as said terms are used in this instruction) is explained by the other instructions of the Court.

II. The Court further instructs the jury, that if they shall find that the plaintiffs incurred losses provable under said bond (as such provable losses are defined by the instruction of the Court) in excess of said sum of gross loss mentioned and defined in the Court's first instruction, then the plaintiffs are entitled to recover from the defendant such an amount of loss, made up of said provable losses, as the jury may find they have incurred in excess of said gross loss of $10,000, with interest, in the discretion of the jury, from August 1st, 1894, provided that their verdict, if found for the plaintiffs under this instruction, shall not exceed the sum of $20,000.

III. The Court further instructs the jury, that in computing the losses under the Court's first and second instructions, if they shall find that any loss or losses included in said computations resulted in whole or in part from sales and shipments made between June 1st, 1892 and May 31st, 1893, they shall deduct from said loss or losses, an amount equal to twelve and a half per cent of said loss or losses, and shall further deduct therefrom all amounts procured by the plaintiffs upon said loss or losses up to and including May 31st, 1894, and also all amounts that the jury may find from the evidence were procurable by the plaintiffs upon said date, and in no case are they to allow any loss or losses beyond the sum of $5,000 in the case of any one insolvent debtor, when said loss or losses resulted from sales and shipments made between June 1st, 1892, and May 31st, 1893.

Provided, if under this prayer the jury should find that any of the above losses exceed at the time of failure the sum of $5,000, and that any payments were made thereon, then the jury must first prorate such payments as provided for in paragraph 7, of the fifth prayer, and the apportionment belonging to said $5,000, and twelve and a half per cent on said $5,000, and the *pro rata* of all amounts which the jury may find were on May 31st, 1894, procurable, must be deducted from said $5,000.

IV. If the jury should find in computing the loss under the Court's second instruction that a loss or losses resulted in whole or in part from sales and deliveries of goods made between June 1st, 1893 and May 31st, 1894, then they are to deduct from said loss or losses all collections they may find from the evidence to have been made by the plaintiffs since the date of said loss, and in no case are they to allow any claims for an amount greater than the amount set forth in the amended bill of particulars.

V. The Court further instructs the jury, that before they can find any losses under the Court's first and second instructions, they must find:

*First.*—That any loss allowed by them resulted from insolvency of debtors, by which is meant " the inability of debtors to pay their debts as they fell due in the ordinary course of business."

*Second.*—That insolvency, as thus defined, occurred subsequent to the payment of the premium upon the bond sued on and prior to the expiration of said bond on May 31st, 1894.

*Third.*—If they should find losses from insolvency under section 1 and 2 of this instruction, they must further find that said losses resulted from sales and deliveries of goods, wares or merchandise owned by the plaintiffs to firms or individuals actively engaged in commercial and mercantile pursuits in the United States of America between June 1st, 1893 and May 31st, 1894, or from sales and shipments of goods usually dealt in by the plaintiffs between June 1st, 1892 and May 31st, 1893.

*Fourth.*—If they find that the sales and deliveries mentioned in section 3 of this instruction were made between June 1st, 1893 and May 31st, 1894, they must further find that the debtor had in the latest January and July book of the R. G. Dun Co., prior to each shipment of goods made to him, one of the ratings as the capital and credit set forth in section 3 of the bond in suit.

*Fifth.*—If they find that the sales and shipments mentioned in section 3 of this instruction were made between June 1st, 1892 and May 31st, 1893, they must further find that the debtor had in the latest published books of the R. G. Dun Co., prior to each shipment of goods, a rating from the capital mark " H " and upward with either the first or second credit rating on " K 3½."

*Sixth.*—If they shall find that a debtor had one of the ratings mentioned in either of the two preceding sections of this instruction, they shall not allow a loss in excess of thirty-five per cent of the lowest capital rating of such debtor; and where such debtor's indebtedness arose out of sales and shipments of goods made between June 1st, 1892 and May 31st, 1893, they shall not allow on any indebtedness to the plaintiff, from such debtor incurred between those dates, a greater amount than $5,000; and where such indebtedness arose out of sales and deliveries of goods, made between June 1st, 1893 and May 31st, 1894, they shall not allow any indebtedness of any debtor to the plaintiff beyond the sum of $10,000.

*Seventh.*—(In connection with the third instruction), the Court further instructs the jury that if, under the instructions of the Court, they shall find any indebtedness to the plaintiffs on the part of any debtor, arising out of the sales and shipments of goods by the plaintiffs to such debtor between June 1st, 1892 and May 31st, 1893, and shall further find that any collections have been made by the plaintiffs on account of such indebtedness of such debtor since the insolvency of said debtor, then they are to apportion the amount so collected from such debtor, since the

failure of such debtor, between the plaintiffs and defendants in the proportion that the sum of $5,000 bears to the whole amount of said indebtedness in excess of said sum of $5,000, giving to the defendant the amount of such collections, which, by such apportionment, would belong to the sum of $5,000, and to the plaintiffs the amount of such collections which would, by such apportionment, belong to the excess over the sum of $5,000.

*Eighth.*—Before allowing any losses they must further find that preliminary proofs of loss were sent defendant for said losses by the plaintiffs, in conformity with section 4 of the bond in suit; and that final proof of loss was sent to defendant in conformity with section 12C of the bond in suit.

VI. That there is no evidence in the case tending to show that any of the debts included in the amended bill of particulars for losses resulting from sales and shipments made between June 1st, 1892 and May 31st, 1893, were under extension at the time of the payment of the premium for the bond sued on this case.

The cause was argued before McSHERRY, C. J., BRISCOE, PAGE, BOYD, PEARCE, SCHMUCKER and JONES, JJ.

*William A. Fisher* and *D. K. Este Fisher* (with whom was *Wm. Cabell Bruce* on the brief), for the Credit-Indemnity Company.

The *object* of the contract is shown by the seventh question in the application. It seeks to ascertain what have been in years past the gross and net losses and gross sales of the applicant, with a view to making the bond an indemnity against losses in excess of the average yearly loss; and it is only against the *excess loss*, beyond the usual ("first loss," "initial loss") loss, that the bond is intended to be an indemnity.

Therefore, in order to ascertain what is the amount of the losses occurring during the year for which the bond

was written, as to which the question of the appellant's liability may arise, the gross losses of the appellant *first occurring* to the amount of $10,000, are to be deducted from the *total* amount of losses which occurred during the year June 1st, 1893, to May 31st, 1894, upon sales and deliveries of goods during that period made by the appellees. The appellees are not at liberty to take *any $10,000 of losses they please*, and deduct them from the total. The appellant is not interested in any losses of the appellees until their gross losses *first occurring* resulting from insolvency of their vendees upon goods sold and delivered to them *have reached* $10,000; for the appellees "*first agree to bear*" their own loss before the appellant shall indemnify them, and it is not until after the appellees have borne their first loss that the appellant's liability begins, and then only subject to the terms and conditions of the contract.

Nor does the appellant agree to indemnify the appellees against every *excess loss*. Before the loss can become a subject of consideration at all, whether it be an initial loss or an excess loss, it must appear that it is :

(*a.*) A loss upon goods sold and *delivered*

(*b.*) *within the year*, June 1st, 1893—May 31st, 1894,

(*c.*) and that such *loss resulted from the insolvency* of the vendee—the debtor for the goods ;

(*d.*) that the debtor had a particular " rating " specified in the bond,

(*e.*) and that the insolvency is shown in a particular way.

(*f.*) That notice was given as required by Condition 4.

(*g.*) That the final proof of loss was filed as required by Condition 12C.

No competent evidence was offered as to the deliveries of some of the goods claimed as losses. The question here is not whether the appellees did all that was required as between them and the vendees to pass title to the alleged vendees of the goods ; but whether the evidence was sufficient to establish an actual delivery of the goods to the vendees ; for the bond requires delivery to be made. If

the appellants had intended to be bound by deliveries to a carrier, then it would have stipulated for liability in case of loss by insolvency, on sales and " shipments " of goods as does the United States Credit System Company's Certificate No. 1204, the liability of which was assumed by the appellant by the " rider." But the bond declares explicitly for " delivery," and the stipulation that there shall be " delivery " to the vendee cannot be met by proof of " shipment " to the vendee.

The appellees argued below that the proof was sufficient, because delivery to a common carrier was delivery to the vendee. But the question does not here arise between the vendor and vendee as to whether title passed or not. Yet, if the appellant could be bound by the same kind and amount of proof as would be sufficient between vendor and vendee to establish delivery, still the argument would be untenable, because delivery to a common carrier is not delivery to the vendee, unless the terms of sale (express or implied) were that delivery should be made to a common carrier. *Magruder* v. *Gage*, 33 Md. 348. In no instance did the appellees prove any term of any alleged sale except the term of credit upon which the alleged sale was made. If the terms of sale were (and we don't know, for they were not proven) that the goods should be at the risk of the appellees in transit, or should be delivered at the town or city of the vendee, or at his place of business, then, of course, delivery to the carrier could in no sense and for no purpose be treated as delivery to the vendee. *Magruder* v. *Gage, supra.*

The appellees could have proved the terms of sale, and they could also have proved the actual delivery of the goods, if they ever reached the vendees, by producing as a witness the servant or employee of the carrier who made the delivery. Nothing of the kind was attempted; but the appellees relied, as proof of delivery, mainly upon the statement of Leitz, the shipping clerk, that the envelopes containing the invoices and bills of lading were not returned to

the appellees unopened, which, the counsel of the appellees argued, amounted to an *admission* on the part of the vendees that they had received the goods, and that admission of the receipt of goods were equivalent to proof of delivery. But at most, *there was mere silence* on the part of the vendees, and even if they had made *express* admissions of the receipt of the goods, those admissions would not be evidence in an action between other parties. Their admissions would be "*res inter alios acta*" and incompetent as evidence to charge the appellant.     Such was the decision of the Court in *Griffith* v. *Turner*, 4 Gill, 111.     See also *McClellan* v. *Kennedy*, 8 Md. 252; *Hatch* v. *Elkins*, 65 N. Y. 496; *Eakle* v. *Clark*, 30 Md. 325.

Having in Condition 11A defined the method of proof of the insolvency, the responsibility for which the appellant was assuming, it was plain that the holder of the bond could prove it in no other way than as pointed out in Condition 11A, unless an exception was made.     Consequently 11B was inserted *as an exception* to 11A, and under it the bondholder *has permission* ("the indemnified *may* prove, etc."), to prove his claim by showing by *legal* proof (that is the usual proof of insolvency) "the insolvency of the debtor" in addition to proof of the appointment of a receiver, etc.

The appellees' counsel argued that Condition 11A and 11B, could not have been intended as laying down the only method of proof of insolvency, because one of the most important, satisfactory and conclusive means of proving insolvency was omitted, that is by proper evidence that a Court of Insolvency had adjudged the debtor insolvent. It may be that in the preparation of Condition 11A and 11B, that method of proof was inadvertently omitted; but its omission scarcely seems to be sufficient evidence to overcome the strong evidence already mentioned of the intent to restrict rather than extend the method of proof.

The fact that the appellant is engaged in a most hazardous business is another reason for believing that Condition 11A was intended to be restrictive.     If our understanding

of the meaning of *Condition 11A* is correct, then the proof of insolvency failed in reference to the appellees' claims on accounts of certain concerns.

*Condition 12B* of the bond asserts that "when claims shall " be allowed by this company beyond the amount agreed to " be borne by the indemnified, such claims shall *at once* be " transferred to this company, and this company shall be- " come the owner thereof, etc."

To be entitled to demand payment from the appellant, it was necessary therefore, that the appellees should be able, when making such demand, to transfer to the appellant, the claim on account of which the demand was made, unless the appellant waived the right secured by Condition 12B. But the appellees, instead of so doing, compromised and released or assigned away to others some of the claims for loss on account of which this action was brought.

While the appellees contended at the trial that they were authorized to make the settlement, they realized that that contention could not be maintained, and went far beyond it in offering their fifth prayer, *which the Court granted.* It utterly ignores and overrides the rights of the appellant secured to it by Condition 12B. It erases from the contract a material stipulation. That prayer instructed the jury "that the contract does not require the plaintiffs in order to enable them to recover to sue any insolvent debtor, nor does said contract prevent said plaintiffs from making compromises or settlements with insolvent debtors, if such compromises were reasonable and such as a prudent man under the·circumstances would make with an insolvent debtor, and such compromise or settlement tended reasonably to reduce the amount of loss occasioned by the insolvency of the debtor settled with. But if such compromise or settlement with the insolvent debtor be found by the jury to have been reasonable and such as a prudent man would make in order to reduce the loss by the insolvency of the debtor, and such as tended to reduce the loss of the plaintiffs by such insolvency, then the defendant is bound by such settlement and by the consequences resulting therefrom."

A renewal of the certificate in the United States Credit System Company, means the *same* certificate, with all its stipulations, continued for another year, or another certificate to cover another year identical in every word and figure with the certificate it succeeded.    Such a renewal would contain the same initial loss of $6,250, the same limit of liability and the same stipulations as the one it succeeded.    Losses on goods shipped during the term of the renewed certificate, which could be proved against the certificate, would be such as were *in excess* of the initial loss of $6,250.

Therefore the losses which the appellees could bring against the bond by virtue of the rider would be those only which were in excess of $6,250, and the appellant is entitled to the benefit of the initial loss provided by the certificate, if it is to be responsible for losses which could be proved against a renewal of it.    The amount of *excess losses* for which the United States Credit System Company could be held is to be determined by the application of the $5,000 limit of liability on any one claim, and by deducting from all *claims* twelve and a half per cent of them, and all amounts " procured or procurable theron at the time of the final payment of this company."    *Rice* v. *National, &c., Co.* 164 Mass. p. 286.

The *amount* of losses assumed by the " Rider " on the bond is to be determined in this manner.    The provable losses under the bond are to be determined by the stipulations and conditions in the bond, and the provable losses assumed by the " *Rider* " are to be determined by the stipulations and conditions of the *certificate*, and when so determined, are to be *proved* as though they were losses occurring under the bond between June 1st, 1893 and May 31st, 1894.    Therefore it is submitted that the Court erred in ignoring the initial provided by the certificate, and that its instructions to the jury were erroneous.    *Am. Cr. Indem. Co.* v. *Athens Woolen Mills*, 92 Fed. R. 581, p. 584.

By the true terms of the Condition 12A of the bond this gross loss of $10,000 was the equivalent, not of the initial

loss for two years, but of the " agreed amount of *annual net loss* "—one year's loss. " The primary purpose of the contract under review," says the St. Louis Court of Appeals, " is a division of liability between the parties." *Brierre* v. *American Credit-Indemnity Co.*, 67 Mo. Appeals, 386.

*J. Markham Marshall* (with whom was *Charles Marshall* on the brief), for Strouse & Bros.

McSHERRY, C. J., delivered the opinion of the Court.

The record in this case is quite voluminous. There are seven bills of exception—six signed at the request of the defendant, and one at the instance of the plaintiffs. The plaintiffs offered five prayers, four of which were rejected. The defendant presented sixty-nine prayers, three of which were granted. The Court gave six instructions drawn by the plaintiffs in accordance with the trial Court's views. There are fourteen special exceptions to these instructions ; and there are twenty-five motions to strike out evidence admitted subject to exception. It will be simply impossible to treat separately each of these one hundred and twenty-six questions ; and we must accordingly content ourselves with a general discussion of the controlling legal principles applicable to the whole case, and then reduce to appropriate groups these numerous points and in that way dispose of them.

The suit was instituted by Strouse & Brothers against the American Credit-Indemnity Company, of New York, upon a bond of indemnity. The American Credit-Indemnity Company is a company which for a stipulated premium guarantees a creditor, to a specified amount, against losses resulting from the insolvency of his debtors. It furnishes a species of insurance. The bond which it issued is coupled with many conditions. On the fifth day of June, 1893, this company, in consideration of a written and printed application, which was made part of the contract of idemnity, and upon the payment of five hundred and eighty dollars, and

in further consideration of the acceptance of the terms and conditions embodied in the bond, bargained and sold to Strouse & Brothers a bond of indemnity guaranteeing them against loss, to the extent of and not exceeding twenty thousand dollars, resulting from the insolvency of debtors, over and above a net loss of seven thousand five hundred dollars first to be borne by the indemnified, on total gross sales and deliveries of goods, wares and merchandise amounting to one million six hundred thousand dollars, and made between June the first, 1893 and May thirty-first, 1894, to firms, corporations or individuals actually engaged in commercial and mercantile pursuits in the United States. Most of the conditions consist of descriptions of what are provable debts and of directions as to the mode of proving them. Some of these must be stated, because upon their construction much of the controversy depends. The Indemnity Company is not liable for any debts unless the debtor had a certain rating in Dun & Company's mercantile agency book; and its liability is limited as respects any one insolvent debtor to thirty-five per cent of the lowest amount of the capital rating given such debtor by that agency; and no account against any one insolvent debtor can be proved for more than ten thousand dollars. Proof of loss must be furnished within twenty days after knowledge of the insolvency of any debtor shall have been received by the indemnified; and final proof of loss must be forwarded within twenty days after the expiration of the bond; and the amount due by the company must be adjusted and is made payable within sixty days after the receipt of the final proof of loss. Both the preliminary and the final proofs of loss are required to be made on blanks provided by the company. This scheme of indemnity includes two classes of losses. The one, an initial loss, which must be borne by the indemnified; the other, a loss in excess of the initial loss, which must be borne by the indemnitor. Both kinds of losses are such as result from the insolvency of the debtors who owe the indemnified. Ob-

viously, the inquiries which first suggest themselves are these : What is meant by the term "insolvency" as used in the body of the bond ?    Which are the losses that belong to the two classes respectively ?    What is the period of time at which the initial loss must be ascertained, as upon the location of that time the extent of the liability of the indemnitor in a large measure depends.

It is insisted by the company that the term "insolvency" is limited and defined by Conditions 11A and 11B indorsed upon the bond.    These clauses are as follows :  "11A. General assignments of, or attachments against insolvent debtors, the absconding of the debtors, or executions returned *nulla bona*, shall constitute insolvency."  "11B. The appointment of a receiver, a ' sell-out,' or the death of a debtor does not establish insolvency, but the indemnified may prove such claim during the term of this bond or renewal thereof, provided legal proof shall be given establishing the insolvency of the debtor."  These bonds of indemnity and certificates are contracts confined to the business affairs of merchants, and relate exclusively to the insolvency of merchants.    Naturally, then, it must follow that the insolvency against which they afford indemnity is insolvency as understood by merchants and as defined in bankrupt and insolvent laws relating to merchants and mercantile transactions ; unless a contrary or different purpose is clearly and unequivocally manifested by some term of the contract.    On the face of the bond protection against loss " resulting from the insolvency of debtors " is afforded. The insolvency designated is the usual, legally defined insolvency—which is an inability of the debtor to pay his debts as they fall due in the ordinary course of business, and this is dependent neither upon a formal adjudication nor on an actual insufficiency of assets to meet liabilities.  *Castleberg* v. *Wheeler*, 68 Md. 266.    As a defeasance clause limiting the liability of the indemnitor must be clearly expressed and strictly construed (*Credit Ind. Co.* v. *Cassard*, 83 Md. 272), conditions 11A and B cannot be held to

narrow the meaning of the term insolvency as used in the body of the instrument. "General assignments of, or attachments against, *insolvent* debtors * * * shall constitute insolvency." "The absconding of debtors, or executions returned *nulla bona* shall constitute insolvency." Obviously, this means that these things shall constitute *evidence* of insolvency. It is not *every* general assignment, or *every* attachment that is declared to constitute insolvency ; but such an assignment made by, or an attachment issued against, an *insolvent* debtor. But who is an insolvent debtor ? Unless you reason in a vicious circle the answer must be one who is unable to meet his obligations as they fall due in the ordinary course of business. An execution returned *nulla bona* cannot *constitute* insolvency. The return is the act of the officer and not of the party, and no act of a third person can *constitute* a debtor's insolvency. Insolvency is a *status*. *Brown* v. *Smart*, 69 Md. 332; s. c. affirmed, 145 U. S. 457. The return on an execution may be *evidence* of that *status*, but is not the *status* itself. These four things named in Clause 11A do not create the *status* or condition of insolvency—they are simply results which flow from the antecedent, pre-existing insolvency. They are therefore evidence of the thing from which they proceed, they are not the thing itself. Section 11B makes this demonstrably clear. "The appointment of a receiver, a sell-out, &c., does not *establish*," that is, does not prove insolvency ; but "legal proof" may be given "establishing the insolvency of the debtor," that is, establishing his inability to pay his debts as they fall due in the ordinary course of business. Now, if nothing but the things named in 11A *constituted insolvency* there could be no "legal proof" of insolvency under 11B, because there could be no insolvency to be proved unless there was a general assignment, an attachment, an absconding, or a return of *nulla bona*. A thing which in its very nature cannot constitute insolvency, though it may constitute *evidence* of insolvency, cannot, by being *called* insolvency, be other than it intrinsically is ; namely,

a means of proving the existence of insolvency. This must be so unless the thing to be proved is identical with the thing that proves it—unless insolvency as a fact, and the evidence which proves that it is a fact, are one and the same thing.    But the two are manifestly different.

In *Am. Cr. Ind. Co.* v. *Carrollton Co.*, 95 Fed. Rep. 114, there was a suit against this same defendant on a bond issued in 1895.    In bonds issued by it after 1893, Clause 11A was materially modified.    Insolvency was limited and defined by the modified clause, thus indicating that the defendant did not itself consider that the precise clause now before us imposed a limitation as it stood prior to the change.

One of the difficulties with respect to the ascertainment of what losses are to be included in the initial loss of seven thousand five hundred dollars is alleged to arise out of Condition 12A, which is in these words :    " To simplify adjustment and to avoid disputes, it is agreed that such sum of gross loss shall be the limit to be borne by the indemnified, as less twenty-five per cent will equal the agreed amount of annual net loss; all claims making up such said sum of gross loss to remain the property of the indemnified, the company relinquishing its claims except as hereinbefore provided." The face of the bond having limited the liability of the indemnitor to losses in excess of a *net* loss which the indemnified was required to sustain in the first instance, it obviously became necessary to prescribe some method by which the net loss should be ascertained.    The very term *net* loss implies a resultant, remaining loss after credits or collections are deducted.    But what credits or collections are to be deducted ?    It might in many, if not in most cases, be impossible to estimate in advance of their actual receipt what these credits or collections would aggregate, and yet until ascertained or estimated a *net* loss could not be determined ; and thus there would be a wide field for controversy left open perhaps long after the period for adjustment had passed.    To preclude just such controversies this Clause 12A, which fixes by agreement an amount that

the parties stipulate shall be the equivalent of the net loss, and shall be considered the indemnified's initial loss, was inserted.    It was not possible to express the amount in dollars and cents, because the net loss of $7,500 was fixed at fifteen thirty-seconds of one per cent upon a basis of sales amounting to $1,600,000, and was to increase, under the provisions of Clause five, in the same ratio if the sales exceeded the basis just named.    An equation was substituted for the specified net loss, and this was done avowedly to avoid disputes and to simplify adjustment; and this equivalent statement simply declares that a *gross* loss which, after twenty-five per cent of it shall be deducted from it, will equal the *net* loss, shall be the measure of the initial loss. In this case it is the sum of ten thousand dollars, because the sum of ten thousand dollars, less twenty-five per cent of $10,000, or $2,500, is equal to seven thousand five hundred dollars.    All sums collected on the debts forming this gross loss are to be retained by the indemnified and go to reduce the amount of the initial loss ; and all sums collected on the debts which make up the liability of the indemnitor belong to the latter and diminish the total of its loss.    But at what period of time is the adjustment of the gross initial loss and therefore the ascertainment of the Indemnity Company's proportion of the whole loss to be determined ?    Is it when and as each loss occurs, or is it only when the bond expires ?    The answer to these questions will settle another issue upon which the parties differ most radically.

On the part of the plaintiffs it is insisted that the initial gross loss of ten thousand dollars is to be determined as of the dates of the failures which first occur, and that the sums due at the date of the failure are alone to be reckoned without abatement on account of payments subsequently made; whilst the company contends that the time for computing this gross loss is the time when the liability under the bond is to be adjusted, that is, as of the date of the expiration of its term, and that the sums *then* due are the amounts to be considered.    There are two proofs of

loss required to be submitted. One, under Clause four,
within twenty days after knowledge of the insolvency of
any debtor has been received by the indemnified; the other,
a final proof of loss under Clause C, within twenty days
after the expiration of the bond. It is declared in Clause
C that "the amount due by this company *under final proof
of loss* shall be adjusted and paid within sixty days after
receipt by the company of such final proof of loss." The
amount due by the company is the amount ascertained
under the *final* proof of loss. That amount is dependent
on the amount of the initial gross loss sustained. If the
initial gross loss sustained is less than the initial gross loss
named in the bond, then there is no loss in excess of the
initial gross loss, and, consequently, no loss for which the
company is liable. So the company's liability can only be
ascertained when the initial gross loss has been reached,
and as the company's liability is referable to the *final* proof
of loss, necessarily the ascertainment of the initial gross
loss, which fixes that of the company, must be also refer-
able to the same period. This is made so clear by the
learned Judge who heard the case below, that we quote
from his opinion as follows:

"In the preliminary proof the whole amount due on
any claim at the time of failure is to be stated; in the final
proof, which covers all claims, the indemnified is required,
both as to claims which go to make up the initial gross
loss, and those which make up the loss which the company
must bear; to state again the whole original indebtedness
and also all amounts paid since the date of failure on each
claim. The requirements of proof apply to each class of
claim. See *Jaeckel* v. *Am. Cr. Co.*, 54 N. Y. Supp. 505.

"It is conceded that the liability of the company on the
excess over the initial loss borne by the indemnified, is re-
duced by payments made between the date of insolvency
and the expiration of the bond, and I think the same rule
should apply in ascertaining the initial gross loss. If not,
why is the indemnified required to make a statement in his

final proof of all payments made on claims which go to make up his initial gross loss.    The condition relied on by plaintiffs, which provides that the claims " making up " the initial gross loss shall remain the property of the indemnified, does not help us to dispose of the point now considered. The question still remains, what claims make up the initial gross loss?    The loss must be made up of claims as they exist when it is made up, and so we come back to the question, when is it to be made up?

" If the plaintiffs be right, such a case as this may easily be imagined; for instance, early in the year some debtor fails owing the indemnified party $10,000; by the end of the year the whole debt has been paid off; in such a case, under the construction of the plaintiffs, the indemnified would have the right to hold the company for losses in excess of this $10,000 without having himself borne an initial loss of one dollar.

" The case put for illustration is not altogether imaginary, nor at all impossible.    The very facts suggested hypothetically have actually occurred in the case of one claim involved in this suit.    The whole debt due by McMurray at the time of his failure was paid off before the bond expired, and yet the plaintiffs claim that the full amount of this debt should be counted in making up their initial loss, although nothing has been lost on it.    I cannot accept a construction that would lead to such a result, nor can I see how Condition 12A operates to fix one time for computing the initial gross loss, when Condition 12C provides another for adjusting the company's liability.

" The time for computing the initial gross loss is, in my opinion, the time when the liability under the bond is to be adjusted, that is, as of the date of the expiration of its term, and therefore all these intermediate payments must be deducted."

As the company's liability does not begin until the initial gross loss has been sustained it would seem to follow necessarily that this gross loss, which is the first to be borne,

should be made up of those losses that first occur, and it equally follows that those payments which the indemnified is entitled to retain in reduction of his initial gross loss are those which are made after the time for adjustment, upon claims included in the initial loss; whilst the payments which the company is entitled to receive in reduction of its loss are those made after the same period on debts which form the basis of its liability.

But this does not settle by any means all points of difference between the parties. There is a stipulation affixed to the bond, and that stipulation, which is called a rider, has caused much of the controversy. The rider is in these words: "In consideration of the lapsing of certificate No. 1204 in the United States Credit System Company, of Newark, N. J., it is agreed that any losses which occur subsequent to the expiration of said certificate and which would be·provable under a renewal of said certificate, may be proved hereunder in accordance with the terms and conditions of this bond, provided that no claim under extension at the time of payment of the premium, shall be included in the protection under this bond." Under certificate No. 1204, The United·States Credit System Company agreed to pay Strouse & Brothers a sum not exceeding twenty thousand dollars in excess of $6,250, on the total gross sales and shipments of merchandise made between June the first, 1892, and May the thirty-first, 1893, as said Strouse & Brothers may actually lose on such shipments on legally ascertained insolvent debtors whose insolvency occurred after the payment of the guarantee fee and who had a certain credit rating in R. G. Dun & Company's books, and whose debts did not exceed $5,000 for any one debtor. It was further stipulated that twelve and a half per cent of the amount due, and all amounts procured and procurable shall be deducted from all claims. By a further provision in the certificate it was stipulated that the $6,250 mentioned in the certificate was the amount of the initial loss first to be borne by the indemnified before the liability of the Credit

System Company would arise.   Now, the question is, does the rider carry into the bond all the terms and conditions of certificate No. 1204 ?

It will be observed that by the explicit words of the rider any losses which occur subsequent to the expiration of the certificate, that is, subsequent to May the 31st, 1893, and which would be provable under a renewal of the certificate, may be proved under the bond in accordance with the terms and conditions of the bond.   The certificate covered sales and shipments from June the 1st, 1892, to May the 31st, 1893; the bond covered sales and shipments from June the 1st, 1893, to May the 31st, 1894.   The two together embraced the sales and shipments for *two* years.   If the terms and conditions of the certificate are not carried into the bond then the company would be liable for the losses of *two* years, though it could not insist upon an allowance of an initial loss for more than *one* year.   The learned Judge below decided that the initial loss of $10,000 fixed by Clause 12A of the bond was the only initial loss which could be charged to the indemnified ; and that the initial loss of $6,250 prescribed by the certificate and applicable to sales made during the year preceding the date of the bond, but under the protection of the certificate, was not imported by the rider into the bond at all.   In effect, therefore, the ten thousand dollars gross initial loss, which was, according to Clause 12 A, " the agreed amount of *annual* net loss," becomes, not the equivalent of an *annual* net loss, but the gross loss for *two* years.   Is this the meaning of the rider ?   " Losses which occur subsequent to the expiration of said certificate and which would be provable under a renewal of said certificate, may be proved hereunder in accordance with the terms and conditions of this bond."   This clause relates to two subjects.   First, the thing to be proved ; second, the mode of proving it.   Now, the thing to be proved is not merely a loss, but a particular loss, that is, a loss which would be a loss provable under a renewal of certificate No. 1204.   Then to certificate No. 1204 resort must be had to ascertain what

losses occurring subsequent to its expiration, would be provable under a renewal of it. A renewal of it would be simply an extension of it with all of its terms and conditions. Upon turning to it, this provision will be found: "Covered losses occurring after this certificate expires on shipments made during its term are provable under the renewal hereof, as if the goods had been shipped thereunder." If the goods had been shipped under the renewal of certificate No. 1204, that is, under a duplicate of it for another year, the thing to be proved—the loss—would have been a loss in excess of the initial loss of $6,250, and in excess of twelve and a half per cent of the claim and in further excess of all amounts procured and procurable from the debtor, because that residue, and that residue only, would have been the covered loss. The provable debt is the thing to be proved, and under the terms and conditions of the certificate, only such debts as were in excess of the initial loss and of the abatements just named, were losses which the Credit System Company undertook and stipulated to be liable for. There was a further restriction to the effect that no single indebtedness could be proved for a larger amount than $5,000. All these conditions and restrictions were descriptive of the thing that could be proved. In the third instruction given by the Court all of these conditions, save the one respecting an initial loss, are conceded to be imported into the definition of losses covered by the rider. The initial loss condition is just as much a part of the description of the loss, and therefore of the debt to be proved, as is either the twelve and a half per cent deduction or the limit of five thousand dollars upon a single claim. The terms and conditions of the certificate, and not part of them, must determine what are provable losses under the rider, precisely as the terms and conditions of the bond must fix what are provable losses under the bond. *Am. Cr. In. Co.* v. *Athens Woolen Mills*, 92 Fed. Rep. 581.

Now, the *mode* of proving the thing to be proved under the rider, is a mode which is in accordance with the terms

and conditions of the bond, that is, in accordance with the mode prescribed by the bond for the proving of a loss under the bond.   It is obvious that there is a wide difference between what loss can be proved and the *mode* of proving that which may be proved ; and whilst the mode of proving the loss must be in accordance with the terms and conditions prescribed by the bond for proving a loss under the bond, the loss to be proved under the certificate is such a loss only, as the certificate defines.   We think, then, the learned Judge below was in error when he ruled that the renewal losses when brought under the bond are on the footing of other losses, and are not subject to any other initial loss than the one provided for by the bond.

The declaration contains two counts.   The first is framed on the indemnity bond, and the second on the rider.   A large mass of evidence was adduced, most of which was admitted subject to exception, and at the close of the case twenty-five motions were made for the exclusion of much of it.   These, save two, were overruled.   The first and second bills of exceptions relate to rulings on the admissibility of evidence.   The third was taken to the disallowance of the motions to exclude evidence already admitted.   As just stated, there were twenty-five of these motions.   One, the *first*, was withdrawn, the *second* was granted, the *thirteenth, fourteenth* and *twenty-second* have been abandoned, and the remaining twenty are before us.   The fourth exceptions assails the granting of the plaintiffs' *fifth* prayer.   The fifth exception relates to the defendants' prayers.   The Court granted the defendants' *fourteenth, forty-first* and *forty-firstA* prayers and rejected all the others numbered from *one* to *four*, both included, and from *six* to *forty-four*, both included, as well as twenty-six numbered *fiveA* to *fiveT,* and also *twelveA, thirteenA, fifteenA, twentyA* and *twenty-oneA.*   Those numbered *one, fiveA, six, twenty-three* and *twenty-four* have been abandoned.   The sixth exception contains the Court's *six* instructions, and the *fourteen* special objections to them. The remaining bill of exceptions was reserved by the plain-

tiffs, and was taken to the refusal of the Court to grant the plaintiffs' first four prayers, to the granting of the defendant's *fourteenth, forty-first* and *forty-firstA* instructions, to the granting of the defendant's *second* motion excluding evidence, and finally to the granting of the instructions given by the Court. The bill of particulars, specifying the items of the plaintiffs' demands, sets forth eighteen instances of insolvency on the part of that number of debtors who owed the plaintiffs various sums alleged to be within the protection of either the bond or the rider; and the numerous special exceptions, motions and prayers relate to these different claims. We will classify these exceptions, motions and prayers and thus condense them considerably.

The trial resulted in a verdict and judgment for the plaintiffs and both sides have appealed.

The third and fifth bills of exceptions will first be taken up. Treating them together the following contentions are presented.

*First.*—It is insisted that there is no evidence legally sufficient to show that the debtors named in the bill of particulars were insolvent within the meaning of the bond or certificate No. 1204. This is raised by the 6th, 7th, 11th, 12th, 16th, 17th, 18th, 19th, 21st and 23rd motions, and by the prayers numbered 8 and 5B to 5T.

*Second.*—It is claimed that there is no evidence legally sufficient to show sales and deliveries of goods, wares and merchandise by Strouse & Brothers to the various debtors named in the bill of particulars; and especially that there is no such evidence of sales and deliveries to Goldsmith & Company and Marks, Goldsmith & Company. These points are raised by the 3rd, 4th and 24th motions, and by the 2nd, 3rd, 4th, 8th, 16th, 17th, 27th, 28th, 29th, 30th, 31st to 38th, 40th, 42nd and 44th prayers.

*Third.*—It is contended that the plaintiffs had no authority to compromise any of the claims included in the bill of particulars. The 9th, 10th, 11th, 12th, 12thA, 15th and 15thA, prayers present this contention.

*Fourth.*—It is asserted that the plaintiffs failed to prove that Goldsmith & Company and Marks, Goldsmith & Company, debtors of the plaintiffs, were rated in Dun & Company's Mercantile Agency book as required by the bond and by certificate 1204. This is raised by motions 5 and 5A, and by the 20th, 20thA, 21st and 21stA, prayers.

*Fifth.*—It is alleged that there is no evidence of the amount of loss sustained by the plaintiffs on the Goldsmith claims. This is involved in motion 9 and in the 18th and 25th prayers.

*Sixth.*—It is maintained that there is no evidence that Lannon, one of the debtors, died insolvent. The 13th and 13thA, prayers were drawn to present this point.

*Seventh.*—It is affirmed that sales made prior to June 1st, 1893, would not have been provable under a renewal of certificate No. 1204; and this is the effect of the 7th prayer.

*Eighth.*—It is declared that promissory notes were taken in payment from Goldsmith & Company. Prayer 9 presents this proposition ; whilst prayer 22 proceeds upon the hypothesis that the accounts due by Goldsmith & Company and by Marks, Goldsmith & Company were under extension when the premium on the indemnity bond was paid ; and prayer 43 relates to an alleged increase in the length of the credit given these same firms.

*Ninth.*—The 26th *prayer* sought to exclude all losses on sales made prior to June 1st, 1892, but it was rejected because in point of fact no sales made before that date were included in any of the claims mentioned in the bill of particulars. The transactions to which the prayer had relation were not sales, for the sales were negotiated and concluded later and clearly fell within the protection of the rider. Nothing more need be said concerning this prayer.

*First.*—Then, as to the question of insolvency. What has been said in an earlier part of this opinion on that subject need not be repeated. Clauses 11A and 11B indorsed on the bond are not intended, as has been pointed out, to con-

stitute a definition of insolvency, or to restrict insolvency to the acts therein named. As there was ample evidence tending to show that the debtors designated in the prayers and motions grouped under this division were unable to pay their debts as they fell due in the ordinary course of business, there was no error in overruling those motions and in rejecting those prayers.

*Second.*—With regard to sales and deliveries. It was shown by the salesman who took the orders for goods from the various debtors, that the orders were taken and were then forwarded to the plaintiffs. These orders first went to the stock department, then to the shipping department, where they were entered in the order-book, and then they went to the shipping clerk, who shipped the goods and charged them up in the shipping-book. It was shown by the shipping clerk that he saw the goods which are charged to these debtors, properly packed; that he superintended the men who nailed and strapped the cases; that he saw these cases marked, made out the bills of lading and mailed them to the customers with the invoices attached thereto. He further testified that he made the entries in the salesbook at the same time he made the shipments; that after the goods were packed and marked, he issued the bill of lading and had the drayman take it and bring it back signed, and that the same evening the signed bill of lading with the invoice pinned to it was mailed by himself. These bills of lading with the invoices attached were mailed in envelopes bearing the monogram and residence of the plaintiffs, and though other letters thus enclosed had come back through the mails to the house, none of the bills of lading and invoices thus mailed to the debtors named in the bill of particulars were ever returned. It was further shown that some of the debtors made payments on account of these very shipments, whilst others sent back small articles included in the goods shipped to them. All shipments were made by common carriers. These circumstances were competent evidence to go to the jury, as they tended to prove

sales, shipments, deliveries and acceptance. *Wharton on Ev.*, sec. 1140. " Should the contract of purchase be silent as to the person or mode by which the goods are to be sent a delivery by the vendor to a common carrier in the usual and ordinary course of business transfers the property to the vendee." *Magruder and Bro.*, v. *Gage*, 33 Md. 344.

In addition to what has just been said, there must be a more particular reference to the sales made to Goldsmith & Company and to Marks, Goldsmith & Company. Louis Goldsmith lived in Baltimore. He carried on business in Spokane, Butte and Salt Lake as Goldsmith & Company ; and with Isidor Marks as a co-partner, he was engaged in business at Ogden. This firm was known as Marks, Goldsmith & Company. All the goods purchased from the plaintiffs for these four houses were bought by Louis Goldsmith in Baltimore, and whilst charged to Goldsmith & Company the house for which they were designed was designated on the ledger. Marks was not a partner in the Spokane, Butte or Salt Lake business. When Goldsmith & Company and Marks, Goldsmith & Company failed, Marks executed an assignment in the firm name ; and the *23rd motion* of the defendant is to the effect that this was not a valid assignment because only signed by one member of the firm. This objection becomes immaterial since it is founded on the assumption that insolvency can only be proved by a general assignment or in one of the other three ways named in Clause 11A ; whereas we hold the contrary and have already ruled that there was sufficient evidence of insolvency to go to the jury independently of any assignment. Whilst there is evidence tending to show that Marks, Goldsmith & Company was a distinct concern from Goldsmith & Company, there is also evidence from which it might be inferred that they were one and the same debtor. But it is not the province of the Court to decide which contention is correct. That was matter for the jury. Much of the argument in this Court was intended to convince us of the identity of these two concerns ; and it was insisted that as Louis Gold-

smith was in fact the real debtor and owed the whole amount charged in separate sums in the bill of particulars against Goldsmith & Company and Marks, Goldsmith & Company, the excess of the total indebtedness over the limit of $5,000 allowed for any one debtor under certificate No. 1204 could not be proved at all.    But it is obvious that the question of fact as to whether the two concerns were identical or were independent, is not a question for us to decide, nor was it one for the Court below to determine; for it was exclusively an issue of fact for the jury.    Upon appropriate hypotheses these conflicting views could have been referred to the jury, but it is not the province of the Court to say which of two contradictory contentions of fact is true.    There was, therefore, no error committed in any of the rulings on the prayers and motions grouped under the second head.

*Third.*—There is nothing in the bond or certificate to show that the plaintiffs had no authority to compromise any claim ; and there is not the slightest evidence to indicate that any injury was done the defendant by any settlement which was made.    The result of the compromises was a diminution of the defendant's liability, and without presenting any evidence to indicate that more money would have or could have been secured from the debtor than was obtained by the compromise, it cannot insist that it is relieved of responsibility merely because some claims were adjusted by compromise.    There was no error in rejecting the prayers relating to this subject.

*Fourth.*—There was no evidence sufficient to go to the jury on the question of the commercial rating of Goldsmith & Company and Marks, Goldsmith & Company.    The record shows that in the R. G. Dun & Company Mercantile Agency book, under the head Baltimore, Goldsmith & Company were rated C. 2, one of the ratings within both the bond and the certificate.    Under the headings Spokane, Butte and Salt Lake, Goldsmith & Company appear, and beneath their firm name is entered " See Baltimore, Md." Under the heading, Ogden, is found Marks, Goldsmith &

Company, and beneath the name is the entry " See Balti-
more, Md." These entries, " See Baltimore, Md.," were in
fact repetitions of the rating given Goldsmith & Company
under the Baltimore heading. The motions and prayers
raising this objection were properly denied.

*Fifth.*—There was sufficient evidence to go to the jury
upon the question of the amount of the loss sustained by
the failure of the Goldsmith concerns, and it would have
been error to grant the motion or the prayers which sought
to withdraw that question from the jury.

*Sixth.*—There was evidence that Lannon died July the
seventeenth, 1893, and that his estate was settled by the
Nashville Trust Company as administrator, and that the
estate paid 52.16⅓ per cent dividend.

*Seventh.*—By the explicit terms of the rider, losses arising
out of sales which were made prior to June the first, 1893,
and which would have been provable under a renewal of
certificate No. 1204, were provable under the rider ; and
there were just such claims included in the bill of particu-
lars and established by the evidence.

*Eighth.*—There is absolutely no evidence that notes were
taken by Strouse & Brothers in payment of the indebtedness
of Goldsmith & Company or of Marks, Goldsmith & Com-
pany. When Goldsmith went to make his purchases for
the spring of 1893, he owed the plaintiffs, for goods pre-
viously shipped to the four Goldsmith establishments, over
eighteen thousand dollars on open accounts which would
be due on June the first, 1893. The plaintiffs, wishing the
business of each season to be closed, required Goldsmith to
give notes maturing in the fall of 1893 for the 1892 indebt-
edness. This was simply changing the evidence of the in-
debtedness from an open account to promissory notes ; and
was not an extension within the meaning of that term as
used in the provision of certificate No. 1204, which declares
that " Losses on claims under extension at time of pay-
ment of the guarantee fee   *   *   *   shall not be included
in the calculation of losses." Nor was this transaction an

extension under a similar provision in the rider.   As used in the certificate and in the rider extension signifies "an agreement made between a debtor and his creditors, by which the latter, in order to enable the former, embarrassed in his circumstances, to retrieve his standing, agree to wait for a definite length of time after their several claims should become due and payable, before they will demand payment."   *Bouvier, Law Dic.* 503, "*Extensions.*"   Requiring notes to be given as evidence of the antecedent debt and making the notes payable at a later date than the open account would have become due did not constitute an extension and did not transgress any provisions of the bond.

These observations dispose of all the questions raised by the motions to exclude evidence and by the rejected prayers of the defendant; and as we find no errors in the action taken by the Court in regard to these motions and prayers, its rulings in the *third* and *fifth* bills of exceptions are affirmed.

The *first* and *second* exceptions relate to the admissibility of evidence.   The first is not very clear——that is, the precise ruling excepted to is not made apparent and was not alluded to in the argument.   The second challenges the ruling which allowed an examination into matters of account appearing on the ledger, the same subject having been previously gone into on cross-examination by the defendant. The plaintiffs clearly had a right to interrogate the witness on the matter thus developed by the defendant.   These rulings are affirmed.

The *fourth* exception concerns the granting of the plaintiffs' *fifth* prayer.   This prayer defined the right of the plaintiffs to make compromises with their debtors.   What has been said in disposing of the defendants 9, 10, 11, 12, 12A, 15 and 15A prayers is sufficient to show that the ruling complained of in this exception is correct.

The *sixth* exception contains the Court's instructions and the defendant's fourteen special objections to them.   The *first* and *second* instructions would be free from error if

they related solely to the bond and did not include losses recoverable under the rider.    In so far as they fix the initial gross loss under the bond at ten thousand dollars, and prescribe *how* and at *what time* the gross initial loss is to be ascertained, they are right ; but the *third* instruction clearly indicates that the first and second were designed also to establish the ten thousand dollar initial loss as the *only* initial loss to be borne by the plaintiffs.    Reading the three together, as they must be read, because the third is in terms made explanatory of the first and second, an inaccurate rule is laid down, and the inaccuracy consists in the exclusion of an initial loss under certificate No. 1204, which, as we have already pointed out, is brought into the bond by the rider.    Had the third instruction further limited the defendant's liability on losses occurring on sales made between June the first, 1892, and May the thirty-first, 1893, by imposing on the plaintiffs the initial loss of $6,250 prescribed in the certificate, all three of these instructions would have been sound.    The *fourth* instruction, whilst right if standing alone, becomes faulty by its connection with the second.    The seventh paragraph of the *fifth* instruction imports into the fifth instruction the erroneous third instruction and thus vitiates the whole.    The first, second, third, fourth, fifth, sixth and eighth paragraphs of the fifth instruction are undoubtedly correct.    As the ultimate result of these five instructions, taken as a series, is to enlarge the liability of the defendant by excluding the initial loss stipulated for by certificate No. 1204, they ought not to have been granted.    If amended to include in an appropriate way that loss they would fairly present the law of the case.    The *sixth* instruction, which is the converse of the defendants' *twenty-second* prayer, declares that there was no evidence that the debts due by Goldsmith & Company were under extension at the time the premium on the bond was paid.    This we hold to be right.    As we have decided that the first, second, third, fourth and fifth instructions in the sixth bill of exceptions ought to have been rejected for a

reason not named in the special objections we need not consider those objections at all. None of them has relation to the sixth instruction.

The remaining exception is the one taken by the plaintiffs to the refusal of the Court to grant their first four prayers ; to the granting of the defendant's 14th, 41st and 41stA prayers ; its second motion for the exclusion of evidence, and to the granting of the instructions given by the Court. The plaintiffs' *first* prayer was wrong because it declared that the initial loss of $10,000 must be made up *at the time of the insolvencies*, instead of at the date of the expiration of the term of the bond. This has already been considered. The first, second, third and fourth prayers were all founded on the theory that the total initial loss under the bond and under the certificate was confined to $10,000. Besides this the *second*, *third* and *fourth* proceeded upon the erroneous hypothesis of the first as to the time of computing the initial loss.

The granting of the defendant's *14th*, *41st* and *41stA* prayers furnishes no ground for complaint. The 14th instructed the jury that there was no evidence of any loss sustained by the plaintiffs upon sales made to McMurry & Brother. The whole debt due by McMurry when he failed was paid off before the bond expired. There was consequently no loss at all. The two other prayers told the jury that the plaintiffs could not recover any amount in excess of that claimed in the bill of particulars. This is certainly sound. The Court on motion struck out the testimony of Rosenthal to the effect that when goods were shipped they were at the risk of the buyer. That was a question of law which depended on the circumstances attending the shipments. The witness could have stated his knowledge as to these circumstances, but not his deduction from them.

In obedience to the requirements of *sec. 19, Art. 5 of the Code*, we have passed upon all the questions presented save and except the fourteen special exceptions to the Court's

instructions and those have not been considered, because upon the instructions being declared erroneous these exceptions became mere moot questions.

Because of the errors we have pointed out in the rulings set forth in the *sixth* bill of exception the judgment must be reversed and a new trial is awarded.

> *Judgment reversed and new trial awarded, the costs above and below to await and follow the final result.*

(Decided April 20th, 1900.)

A motion for a reargument was subsequently made, and in disposing of the same,

McSHERRY, C. J., delivered the opinion of the Court.

We have carefully considered the elaborate brief filed in support of the motion for a reargument of this case, and after mature reflection on the part of each judge who sat in the case and after full discussion in the consultation room, we are constrained to deny the motion.

The main ground relied on in the brief submitted to sustain the motion is that this Court fell into an error when it held in the opinion heretofore filed, that Strouse Brothers were properly chargeable with an initial loss of six thousand two hundred and fifty dollars under the New Jersey certificate in addition to an initial loss of ten thousand dollars under the New York bond. The precise thing decided was that as to claims which the bond covered the indemnified were required to bear an initial loss of ten thousand dollars before the indemnitor became liable at all under the bond ; and that as to the claims which a renewal of the certificate would have covered, the indemnified were required to bear an initial loss of six thousand two hundred and fifty dollars before the indemnitor would become liable at all under the rider attached to the bond. A close and thorough re-examination of this subject has not led us to doubt the accuracy of the conclusion announced in the opinion.

If there had been no rider affixed to the bond, indemnity would have been afforded to the extent of twenty thousand dollars after the indemnified had borne an initial loss of ten thousand dollars.   Consequently, a total loss of thirty thousand dollars would have been divided between the indemnified and the indemnitor in a proportion which would have thrown one-third upon the former and two-thirds upon the latter.   For losses aggregating a less sum, the same ratio would not have been preserved, because, however small the total loss might have been in excess of ten thousand dollars, the indemnified were required to sustain the initial loss of ten thousand dollars, and the indemnitor would only have been bound to make good the amount over and above the initial gross loss.   If there had been no bond issued by the Credit-Indemnity Company (the New York Company), but the indemnified had simply procured a renewal of the New Jersey certificate, the defendant in this case would not have been answerable for anything ; but the other company would have been liable up to the sum of twenty thousand dollars for losses in excess of an initial loss of six thousand two hundred and fifty dollars and other abatements which need not be alluded to.   Now, if the rider brought into the bond and put under the protection of the bond certain accounts which would have been covered by a renewal of the New Jersey certificate, it gave to the holder of the bond the right to demand from the maker of the bond the payment of claims which grew out of transactions antedating the bond, and therefore not included in but added to the class of claims which the bond standing alone would have protected.   As a consequence of this, and upon the assumption that the rider brought under the bond claims which would have been payable under a renewal of the certificate, the liability of the indemnitor—the New York Company—was enlarged by the rider.   To the liability under the bond there was added a liability which would have existed under a renewal of the certificate, but would not have existed under the bond without the rider ; and it became not at all

improbable that the sum of the two might reach a total far in excess of a loss under the bond alone.　This superadded liability imposed upon the indemnitor by reason of the rider bringing under the protection of the bond claims with which, but for the rider, the bond would have had nothing to do, was assumed without an increase of the premium paid for insurance under the bond.　So the effect of the rider was to enlarge the liability of the indemnitor without increasing the amount of the premium paid by the indemnified.　As there was an enlargement of the indemnitor's liability by the addition to the liability under the bond of a liability under the certificate, because the terms of the certificate were imported by the rider into the bond, there was likewise an increase of the initial losses to be borne by the indemnified, if the claims brought under the bond by the rider were claims which were subject to abatement by an initial loss.　But this enlargement of the initial loss did not produce a decrease in the amount of indemnity afforded by the bond ; it constituted simply an addition of two distinct initial losses, distributively applicable to two separate classes of claims.　The aggregate of these initial losses was not applicable to the bond any more than to the certificate. The initial loss provided by the bond continued, despite the rider, to be applicable only to losses covered by the bond ; and the initial loss fixed in the certificate continued to be applicable only to losses which would have been covered by a renewal of the certificate.　No loss covered by the bond could be lessened by the initial loss for which the certificate made provision ; and no loss covered by a renewal of the certificate could be diminished by the initial loss fixed in the bond.

If in the case at bar every loss sued for had been a loss on sales made *after* the date of the bond, no other initial loss than that fixed by the bond, viz : ten thousand dollars, could have been deducted ; and if every loss sued for had been a loss occurring under the certificate no other initial loss than that provided by the certificate, viz., six thousand,

two hundred and fifty dollars, could have been considered. When both classes of losses, those under the bond and those which would have fallen under a renewal of the certificate, were combined in one suit, the initial loss applicable to each class should be dealt with separately ; that is to say, the one suit must be viewed as if it were two distinct suits—one on the bond and one on a renewal of the certificate—and no part of the initial loss belonging to one suit can be borrowed from the other to diminish the amouut recoverable in either. Of course, therefore, if the total loss sustained on claims covered by the certificate were less than the initial loss of six thousand two hundred and fifty dollars, the difference between such total and such initial losses could not be brought over and deducted from the amount recoverable under the bond ; and so, if the total loss on sales and shipments covered by the bond were less than the initial loss of ten thousand dollars, the difference between such total and such initial loss could not be brought over and deducted from the amount recoverable under the certificate. Thus to deal with these initial losses does not *un-insure* the indemnified. The argument is this : If the bond requires an initial loss of ten thousand dollars, the addition of the other initial loss of six thousand two hundred and fifty dollars under the certificate takes away just six thousand two hundred and fifty dollars of insurance or indemnity given by the bond, and thus the very instrument which professes to afford insurance, at the same moment of time uninsures to the extent of six thousand two hundred and fifty dollars. But the fault of this argument lies in its assumption that both initial losses are applicable to the same thing. They are not, in fact, aggregated and applied to losses covered by the bond—they are distributed, the one of ten thousand dollars is applicable to losses under the bond ; the other of six thousand two hundred and fifty dollars is applicable to losses provable under a renewal of the certificate ; and no part of that fixed in the bond can be taken from claims covered by a renewal of the certifi-

cate, just as no part of that fixed by the certificate can be taken from claims covered by the bond.

If you say that the rider brought under the bond every claim that might have been proved under a renewal of the certificate, and that such claims were not subject to abatement by *any* initial loss ; then, undoubtedly the addition of an initial loss to the ten thousand dollar initial loss fixed by the bond, would *uninsure* the indemnified to the extent of the amount of such additional initial loss.   But this way of stating the question assumes the very point in controversy, for it assumes that no initial loss can be charged to the indemnified on losses provable under a renewal of the certificate, though the losses arose after the expiration of the certificate on sales made while the certificate was in force. The precise thing to be ascertained is this, what are the losses which would have been provable under a renewal of the certificate ?   If they were losses in excess of an initial loss of six thousand two hundred and fifty dollars, then only such losses as *were* in excess of *that* initial loss were losses which would have been provable under a renewal of the certificate ; and as the rider did not bring under the bond any other loss than a loss which would have been provable under a renewal of the certificate, it obviously did not *uninsure* any sum that had been insured, if the sum insured was only a sum in excess of the initial loss prescribed by the certificate.   That the sum insured was only a sum in excess of the initial loss was discussed in the opinion filed in this case, and but little more need be added to what was there said.

To ascertain precisely what the rider embraces assume, for the moment, that the New York Company's bond had not been issued, but that the New Jersey Company's certificate had been renewed.   What would then have been the extent of the New Jersey Company's liability ?   This inquiry is pertinent, because, as the rider brings into the bond only losses which occurred subsequent to the expiration of the certificate and which would have been provable under

a renewal of the certificate, it becomes necessary in measuring the extent of the liability imposed by the rider to ascertain exactly what losses would have been provable under a renewal of the certificate, without regard to the provisions of the bond.    Losses resulting from sales and shipments made during the life of the certificate, though not occurring until after the expiration of the certificate, are the losses which a renewal of the certificate would have covered. But does this mean *all* losses?    Could the indemnified have recovered any of those losses without abating the initial loss of six thousand two hundred and fifty dollars? Or, stating the question another way, could the indemnified have recovered any of those losses if the aggregate of them had not exceeded six thousand two hundred and fifty dollars?    Obviously not, because the express stipulation of the contract embodied in the certificate was that no recovery at all could be had against the company issuing the certificate until an initial loss of six thousand two hundred and fifty dollars had first been borne by the indemnified. About this there ought to be no dispute.    It is manifest, then, that the losses which the New Jersey Company would have been liable for under the certificate, or rather under a renewal of it, would have been only losses in excess of the prescribed initial loss.    And this being so, how could the rider, which brought under the protection of the bond only losses that would have been provable under a renewal of the certificate, expand and enlarge the indemnitor's liability and cause it to include something which would not have been recoverable at all under the certificate or under a renewal of the certificate?    It manifestly could not.

The way a proposition is stated may sometimes be misleading.    In the face of a stipulation limiting the initial loss to ten thousand dollars it sounds singular to say that there may be another initial loss of six thousand two hundred and fifty dollars added on, whereby the very instrument professing to insure actually *uninsures* the indemnified.    But when it is remembered that the rider only brings under the

bond such claims as would be provable under a renewal of the certificate, and that claims so provable are those in excess of six thousand two hundred and fifty dollars, it at once becomes apparent that there is no uninsurance of a sum previously insured.   If none other than claims *in excess* of six thousand two hundred and fifty dollars were brought under the protection of the bond, then claims *to the extent* of six thousand two hundred and fifty dollars were necessarily excluded ; and if excluded it would be inaccurate to say that they ever had been included, and if they never had been included, obviously, they were not simultaneously included and excluded.

(Filed July 18th, 1900.)